Pitney Hardin LLP
(MAIL TO) P.O. BOX 1945, MORRISTOWN, N.J.  07962-1945
(DELIVERY TO) 200 CAMPUS DRIVE, FLORHAM PARK, N.J. 07932-0950
(973) 966-6300
Attorneys For Plaintiff
Days Inns Worldwide, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAYS INNS WORLDWIDE, INC., formerly known as DAYS INNS OF AMERICA, INC., a Delaware Corporation, | :<br><br>:  Honorable<br>:  Civil Action No. 05-<br><br>: |
| Plaintiff, | :          **COMPLAINT** |
| v. | : |
| AMIT PATEL, an Individual, | : |
| Defendant. | : |
| | : |

Plaintiff Days Inns Worldwide, Inc., formerly known as Days Inns of America, Inc., by its attorneys, Pitney Hardin LLP, complaining of defendant Amit Patel, says:

Days Inns Worldwide, Inc., Site 2299

## PARTIES, JURISDICTION AND VENUE

1.   Plaintiff Days Inns Worldwide, Inc., formerly known as Days Inns of America, Inc. ("DIW"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Parsippany, New Jersey.

2.   Defendant Amit Patel ("Patel"), on information and belief, is a citizen of the State of South Carolina, residing at 449 Lazy Hill Road, Moncks Corner, South Carolina.

3.   The amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

4.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332 & 1338, 15 U.S.C. § 1121 and, with respect to certain claims, 28 U.S.C. § 1367.

5.   This Court has personal jurisdiction over Patel by virtue of, among other things, section 17.4 of the License Agreement by and between Patel and DIW (the "License Agreement"), described in more detail below, pursuant to which Patel has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

- 2 -

6.  Venue is proper in this District pursuant to section 17.4 of the License Agreement, inasmuch as that provision contains an express waiver by Patel of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Days Marks

7.  DIW is one of the largest guest lodging facility franchise systems in the United States, and is widely known as a provider of guest lodging facility services.

8.  DIW has the exclusive right to sublicense the use of various trade names and service marks (which are on the principal register of the United States Patent and Trademark Office), logos, and derivations thereof (the "Days Marks"), as well as the distinctive Days Inns® System, which provides hotel services to the public under the Days name and certain services to its licensees, including a centralized reservation system, advertising, publicity, and training services.

9.  DIW or its predecessors have continuously used each of the Days Marks since the date of their registration and these marks are in full force and effect pursuant to 15 U.S.C. § 1065.

10. DIW has given notice to the public of the registration of the Days Marks as provided in 15 U.S.C. § 1111.

- 3 -

11.   DIW uses or has used the words "Days Inn," among others, as abbreviations of its brand name.

12.   Through its franchise system, DIW markets, promotes, and provides services to its guest lodging franchisees throughout the United States.  In order to identify the origin of their guest lodging services, DIW allows its franchisees to utilize the Days Marks and to promote the Days Inn brand name.

13.   DIW has invested substantial effort over a long period of time, including the expenditure of millions of dollars, to develop goodwill in its trade names and service marks to cause consumers throughout the United States to recognize the Days Marks as distinctly designating DIW guest lodging services as originating with DIW.

14.   The value of the goodwill developed in the Days Marks does not admit of precise monetary calculation, but because DIW is one of the largest guest lodging facility franchise systems in the United States and is widely known as a provider of guest lodging facility services, the value of DIW's goodwill exceeds hundreds of millions of dollars.

15.   The Days Marks are indisputably among the most famous in the United States.

- 4 -

The Agreements Between The Parties

16.  On or about January 20, 2000, DIW entered into the License Agreement with Patel for the operation of a 100-room guest lodging facility located at Highway 301 South, Jesup, Georgia, Site No. 2299 (the "Facility").  A true copy of the License Agreement is attached hereto as Exhibit A.

17.  Pursuant to section 5 of the License Agreement, Patel was obligated to operate a Days Inn guest lodging facility for a 15-year term, during which time Patel was permitted to use the Days Marks in association with the operation and use of the Facility as part of DIW's franchise system.

18.  Pursuant to section 3 of the License Agreement, Patel was required, among other things, to make renovations to the Facility, in order to bring the Facility into compliance with "System Standards," "Approved Plans," and/or a "Punch List," all of which were defined in or attached to the License Agreement, and to achieve and maintain certain scores on periodic quality assurance inspections conducted by DIW.

19.  Pursuant to section 3.4 of the License Agreement, Patel was required to operate the Facility in compliance with DIW's "System Standards," as defined in the License Agreement, including DIW's quality assurance requirements.

- 5 -

20.   Pursuant to section 4.8 of the License Agreement, DIW had the unlimited right to conduct "quality assurance inspections" of the Facility (and unlimited reinspections if the Facility received a failing score in the inspection) to determine whether the Facility was in compliance with DIW's quality assurance requirements.

21.   Pursuant to section 7 and Schedule C of the License Agreement, Patel was required to make certain periodic payments to DIW for royalties, service assessments, taxes, interest, reservation system user fees, annual conference fees, and other fees (collectively, "Recurring Fees").

22.   Pursuant to section 3.9 of the License Agreement, Patel was required to prepare and submit monthly reports to DIW disclosing, among other things, the amount of gross room revenue earned by Patel at the Facility in the preceding month for purposes of establishing the amount of royalties and other Recurring Fees due to DIW.

23.   Pursuant to section 3.9 of the License Agreement, Patel agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.8 and 4.8 of the License Agreement, Patel agreed to allow DIW to audit the entries in these books, records, and accounts.

- 6 -

24. Pursuant to section 3.10 of the License Agreement, Patel was obligated to obtain and maintain the insurance coverage required under the System Standards Manual, as defined in the License Agreement.

25. Pursuant to section 11.2 of the License Agreement, DIW could terminate the License Agreement, with notice to Patel, for various reasons, including Patel's (a) failure to pay any amount due DIW under the License Agreement, (b) failure to remedy any other default of his obligations or warranties under the License Agreement within 30 days after receipt of written notice from DIW specifying one or more defaults under the License Agreement, and/or (c) receipt of two or more notices of default under the License Agreement in any one year period, whether or not the defaults were cured.

26. Pursuant to section 12.1 of the License Agreement, Patel agreed that, in the event of a termination of the License Agreement pursuant to section 11.2, he would pay liquidated damages to DIW in accordance with a formula specified in the License Agreement.

27. Section 13 of the License Agreement specified Patel's obligations in the event of a termination of the License Agreement, including his obligation to immediately cease using all of the Days Marks.

- 7 -

28. Pursuant to section 17.4 of the License Agreement, Patel agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [License] Agreement or collect amounts owed under this [License] Agreement."

### The Defendant's Defaults and Termination

29. From the inception of the License Agreement, Patel repeatedly failed to operate the Facility in accordance with DIW's System Standards, in breach of his obligations under the License Agreement.

30. On October 11, 2000, DIW conducted a quality assurance ("QA") inspection of the Facility. By letter dated October 26, 2000, a true copy of which is attached hereto as Exhibit B, DIW advised Patel that (a) the Facility received a failing score in the QA inspection and, as a result, Patel was in default of his obligations under the License Agreement, (b) pursuant to the License Agreement, he had 30 days within which to cure the QA default, and (c) if the default was not cured, then reservation service to the Facility would be suspended, certain special stipulations in the License Agreement would automatically terminate, and the License Agreement would be subject to termination.

- 8 -

31. On February 8, 2001, DIW conducted another QA inspection of the Facility, during which the Facility received a failing score. By letter dated  February 15, 2001, a true copy of which is attached hereto as Exhibit C, DIW advised Patel that (a) the Facility received its second consecutive failing score in the QA inspection and, as a result, Patel was in continuing default of his obligations under the License Agreement, (b) the reservation system service to the Facility would be suspended effective February 26, 2001, and (c) due to his continuing default, Patel's additional termination rights under the License Agreement were automatically null and void and the License Agreement was subject to termination.

32. On July 3, 2001, DIW conducted another QA inspection of the Facility.  By letter dated July 17, 2001, a true copy of which is attached hereto as Exhibit D, DIW advised Patel that (a) the Facility received a third consecutive failing score in the QA inspection, which was a continuing default of his obligations under the License Agreement, and (b) as a result, reservation service to the Facility had been suspended.

33. By letter dated September 13, 2001, a true copy of which is attached as Exhibit E, DIW gave notice to Patel that he was in default of his financial obligations under the License Agreement and specifically advised Patel that he (a) had failed to file the monthly franchise reports for the Facility, (b) owed

- 9 -

an estimated $5,824.94 in unpaid fees, and (c) had 10 days to cure this monetary default.

34. By letter dated January 23, 2002, a true copy of which is attached hereto as Exhibit F, DIW advised Patel that (a) he was in breach of the License Agreement for failing to file monthly reports for the Facility for the months of September 2001 through December 2001 and failing to pay DIW Recurring Fees in the estimated amount of $11,109.00, (b) the Facility had been suspended from the reservation system since July 17, 2001, and (c) due to his uncured default, the License Agreement was subject to immediate termination.

35. By letter dated May 2, 2002, a true copy of which is attached hereto as Exhibit G, DIW advised Patel that (a) he was in breach of the License Agreement for failing to pay DIW Recurring Fees in the estimated amount of $17,182.56 and failing to file monthly reports for the Facility, and (b) the License Agreement was subject to immediate termination.

36. By letter dated May 9, 2002, a true copy of which is attached hereto as Exhibit H, DIW advised Patel that (a) he had not confirmed that he had the minimum insurance coverage required by DIW, (b) the Facility had been suspended from the reservation system since July 17, 2001 for continuing QA and monetary default, and (c) if he failed to provide proof

- 10 -

of the adequate insurance within thirty days, DIW would add the failure to provide insurance to the reservation system restriction and the License Agreement would be subject to termination.

37. By letter dated July 19, 2002, a true copy of which is attached hereto as Exhibit I, DIW advised Patel that (a) he still had not provided proof that he had the minimum insurance coverage required by DIW, (b) the Facility had been suspended from the reservation system since July 17, 2001 for continuing QA and monetary default, and (c) if he failed to provide proof of the adequate insurance within five days, DIW would add the failure to provide insurance to the reservation system restriction and the License Agreement would be subject to termination.

38. By letter dated August 17, 2002, a true copy of which is attached as Exhibit J, DIW provided formal notice of termination of the License Agreement, effective November 27, 2002, for Patel's failure to cure his financial defaults, QA defaults, and insurance defaults under the License Agreement. Additionally, DIW advised Patel that, effective as of the date of the termination of the License Agreement, (1) he was to immediately discontinue the use of all Days Inn identification at the Facility, and (2) he would be required to pay to DIW

- 11 -

liquidated damages for premature termination of the License Agreement.

39. The termination of the License Agreement precluded Patel from any further use of the Days Marks in or around the Facility.

40. The termination of the License Agreement precluded Patel from any further use of the Days Marks to induce the traveling public to use the Facility in any way.

41. After the termination of the License Agreement, Patel continued to use the Days Marks to induce the traveling public to rent guest rooms at the Facility.

42. After the termination of the License Agreement, Patel used the Days Marks without authorization to rent rooms through, among other things, failure to remove Days signage from the Facility.

43. By letter dated March 14, 2003, a true copy of which is attached as Exhibit K, DIW reiterated Patel's post-termination obligations under the License Agreement, including the obligation that Patel had been required to completely "de-identify" the Facility as a Days Inn effective upon termination of the License Agreement.

## FIRST COUNT

44.  DIW repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 43 of the Complaint.

45.  Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), provides in pertinent part that "[a]ny person who shall, without the consent of the registrant — use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant . . . ."

46.  Patel marketed, promoted, and rented rooms at the Facility through the unauthorized use of the Days Marks, and such use caused confusion or mistake among prospective or actual customers, in violation of Section 32 of the Lanham Act.

47.  Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in pertinent part that "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely

- 13 -

to cause confusion, or to cause mistake, or to deceive as to affiliation . . . or as to the origin, sponsorship, or approval of . . . goods [or] services . . . shall be liable in a civil action . . . ."

48. The acts of Patel in marketing, promoting, and renting rooms at the Facility, through and with the Days Marks, constituted:

      (a) a false designation of origin;

      (b) a false and misleading description of fact; and

      (c) a false and misleading representation of fact;

that caused confusion, or mistake, or deception, as to the affiliation of Patel's Facility with DIW, and caused confusion, mistake, or deception, to the effect that DIW sponsored or approved of the guest lodging services that Patel provided at the Facility, all in violation of Section 43(a) of the Lanham Act.

49. Patel's acts of infringement in violation of Sections 32 and 43(a) of the Lanham Act were malicious, fraudulent, willful, and deliberate.

**WHEREFORE,** pursuant to 15 U.S.C. §§ 1114, and 1125(a) & (c), DIW demands judgment against Patel granting compensatory

damages, treble damages, attorneys' fees, prejudgment interest, costs of suit, and such other and further relief as this Court shall deem just and proper.

## SECOND COUNT

50. DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 49 of the Complaint.

51. Pursuant to sections 3.8 and 4.8 of the License Agreement, Patel agreed to allow DIW to examine, audit, and make copies of Patel's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

52. Patel engaged in acts and practices, as described, which amount to infringement of the Days Marks in an unlawful, unfair, and fraudulent manner which is likely to confuse the public.

53. As a result, Patel owes restitution and the disgorgement of profits, in an amount unknown to DIW, and which amount cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Patel.

**WHEREFORE,** DIW demands judgment ordering that Patel account to DIW for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility through and with the Days Marks.

## THIRD COUNT

54. DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 53 of the Complaint.

55. DIW terminated the License Agreement effective November 27, 2002.

56. Section 12.1 of the License Agreement provides that, in the event of termination of the License Agreement due to action of the Licensee, Patel shall pay liquidated damages to DIW within 30 days of termination.

57. As a result of the termination of the License Agreement, Patel is obligated to pay DIW liquidated damages in the amount of $200,000.00, as calculated pursuant to section 12.1 of the License Agreement.

58. Notwithstanding DIW's demand for payment, Patel has failed to pay DIW the liquidated damages as required in section 12.1 of the License Agreement.

- 16 -

59. DIW has been damaged by Patel's failure to pay liquidated damages.

**WHEREFORE,** DIW demands judgment against Patel for liquidated damages in the amount of $200,000.00, together with interest, attorneys' fees, and costs of suit.

### FOURTH COUNT

60. DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 59 of the Complaint.

61. By virtue of the premature termination of the License Agreement, DIW sustained a loss of future revenue over the remainder of the 15-year term of the License Agreement.

62. If the Court determines that Patel is not liable to pay DIW liquidated damages as required by section 12.1 of the License Agreement then, in the alternative, Patel is liable to DIW for actual damages for the premature termination of the License Agreement.

63. DIW has been damaged by Patel's breach of his obligation to operate a Days guest lodging facility for the remaining term of the License Agreement.

- 17 -

**WHEREFORE,** DIW demands judgment against Patel for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

### FIFTH COUNT

64. DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 63 of the Complaint.

65. Pursuant to section 7 and Schedule C of the License Agreement, Patel was obligated to remit Recurring Fees to DIW.

66. Despite his obligation to do so, Patel failed to remit certain of the Recurring Fees due and owing under the License Agreement in the current amount of $40,525.63.

67. Patel's failure to remit the agreed Recurring Fees constitutes a breach of the License Agreement and has damaged DIW.

**WHEREFORE,** DIW demands judgment against Patel for the Recurring Fees due and owing under the License Agreement, together with interest, attorneys' fees, and costs of suit.

- 18 -

## SIXTH COUNT

68.  DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 67 of the Complaint.

69.  At the time of the termination of the License Agreement, Patel was obligated to pay DIW Recurring Fees.

70.  Despite his obligation to do so, Patel failed to pay certain of the Recurring Fees due and owing under the License Agreement in the current amount of $40,525.63.

71.  In addition, Patel benefited from his wrongful use of the Days Marks after termination of the License Agreement and paid no royalty or other Recurring Fees to DIW in return for that benefit.

72.  Patel's failure to compensate DIW constitutes unjust enrichment and has damaged DIW.

**WHEREFORE,** DIW demands judgment against Patel for:

(a) All the Recurring Fees due and owing under the License Agreement, together with interest, attorneys' fees, and costs of suit; and

(b) All royalties and other Recurring Fees that should be paid to compensate DIW for the period during which Patel

- 19 -

misused the Days Marks and was thereby unjustly enriched, together with interest and costs of suit.

**PITNEY HARDIN** LLP
Attorneys for Plaintiff
Days Inns Worldwide, Inc.


By: _Dennis R. LaFiura_
       DENNIS R. LAFIURA
       A Member of the Firm

Dated:   December 20, 2005

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

**PITNEY HARDIN** LLP
Attorneys for Plaintiff
Days Inns Worldwide, Inc.

By: _Dennis R. Lafiura_
DENNIS R. LAFIURA
A Member of the Firm

Dated:   December 20, 2005

- 21 -

# EXHIBIT A

Location: Jessup, GA
Entity No. : 8690 6
Unit No.: 2299

# DAYS INNS OF AMERICA, INC.
## LICENSE AGREEMENT

THIS LICENSE AGREEMENT ("Agreement"), dated January 20, 2000, is between **DAYS INNS OF AMERICA, INC., a Delaware corporation** ("we", "our" or "us"), and **AMIT PATEL, an individual** ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

This transaction involves the transfer of an existing Chain Facility at the Location first granted to K & S, Inc., a Georgia corporation ("Prior Licensee"), in a License Agreement with us dated April 5, 1995 (the "Prior Agreement"). You assume and obligate yourself to perform any and all of the obligations (financial and otherwise) of the Prior Licensee under the Prior Agreement that is not paid or performed as of the date of this Agreement, including without limitation, the obligation to pay any unpaid Royalties, Reservation System User Fees or other amounts due us and to correct any uncured defaults other than as expressly superseded by this Agreement.

**1. License.** We have the exclusive right to license and franchise to you the distinctive "Days Inn" System for providing transient guest lodging services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. You will call the Facility a "Days Inn." You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion.

**2. Days Inns Licensee Advisory Association.** You will be eligible to participate in the Days Inn Licensee Advisory Association, a Delaware corporation that is the organization of Days Inn System licensees, in accordance with the Bylaws and Certificate of Incorporation of the Association, as amended, so long as you are not in default under this Agreement.

**3. Your Improvement and Operating Obligations.** Your obligations to improve, operate and maintain the Facility are:

3.1    **Improvements.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards for entering conversion facilities. You must begin improvement of the Facility no later than thirty (30) days after the Effective Date. The Facility must score 400 points (or equivalent) within ninety (90) days after the Effective Date and 425 points (or equivalent) within nine months after the Effective Date. All improvements will comply with System Standards, any Approved Plans, Schedule B and any Punch List attached to this Agreement. Your general contractor or you must carry the insurance required under this Agreement during renovation. If you do not commence or complete the improvement of the Facility by the dates specified in this Section 3.1, or the Facility does not meet the post-transfer quality assurance inspection standard, or complete the post-transfer improvements specified in the Punch List after the Effective Date, then we may, in our sole discretion, terminate this Agreement

1

by giving written notice to you. Time is of the essence for the Improvement Obligation. We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation. The grant of an extension will not waive any other default existing at the time the extension is granted.

3.2  **Improvement Plans.**  You will create plans and specifications for the work described in Section 3.1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location.  We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like.  Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements.  We will not be liable to your lenders, contractors, employees, guests, others, or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction.  Any material variation from the Approved Plans requires our prior written approval. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

3.3  **Opening.**  You may continue to identify the Facility as part of the System prior to completing the Improvement Obligation.

3.4  **Operation.**  You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards.  You will keep the Facility in a clean, neat, and sanitary condition.  You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual. You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility, only with our prior written consent which we will not unreasonably withhold or delay.  Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility.

3.5  **Training.**  You (or a person with executive authority if you are an entity) and the Facility's manager will attend the training programs described in Section 4.1 we designate as mandatory for licensees or managers, respectively.  You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement.  You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1.  You will direct the Facility staff to attend Property Opening Training and reimburse us for our expenses for the training as discussed in Section 4.1.2.

3.6  **Marketing.**  You will participate in System marketing programs, including the Directory and the Reservation System.  You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System.  You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants.  You may implement, at your option and expense, your own local

2

advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.6.1 You may participate in any regional marketing, training or management alliance or cooperative of Chain licensees formed to serve the Chain Facilities in your area. We may assist the cooperative collect contributions. You may be excluded from cooperative programs and benefits if you don't participate in all cooperative programs according to their terms, including making payments and contributions when due.

3.7 **Governmental Matters.** You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings.

3.8 **Inspections and Audits.** You will permit our representatives to perform quality assurance inspections of the Facility and audit your financial and operating books and records (including tax returns) particularly those relating to the Facility and any related business, with or without prior notice of the inspection or audit. The inspections and audits will commence during normal business hours, although we may observe Facility operation and accounting activity at any time. You, the Facility staff and your other agents and employees will cooperate with our inspectors and auditors in the performance of their duties. You will pay us any underpayment of, and we will pay you or credit your Recurring Fee account for any overpayment of, Recurring Fees discovered by an audit. If the Facility does not pass an inspection, you refuse to cooperate with our inspectors or our auditors when they arrive for an audit at a time scheduled at least 3 business days in advance or the audit reveals that you paid us less than 97% of the correct amount of Recurring Fees for a fiscal year or longer, you will pay us the Audit Fee described in Section 4.8, or the reasonable costs of travel, lodging and meal expenses for reinspection and any reinspection fee we may impose We may publish or disclose the results of quality assurance inspections.

3.9 **Reports and Accounting.** You will prepare and submit timely monthly reports containing the information we require about the Facility's performance during the preceding month. You will prepare and submit other reports and information about the Facility as we may reasonably request from time to time or in the System Standards Manual. You will prepare and maintain any reports required under the System Standards Manual in the Facility's property management or reservation computer system, including the name and address of Facility guests, if collected, and send them to us or allow us to access them by means of a telephone datalink. You will allow us access to the reports and data stored on the Facility's property management or reservation computer system via telephone, provided that we will not unreasonably interfere with normal functioning of the property management or reservation computer system. You will maintain accounting books and records in accordance with generally accepted accounting principles and the American Hotel & Motel Association Uniform System of Accounts for Hotels, as amended, subject to this Agreement and other reasonable accounting standards we may specify from time to time. You will prepare and submit to us if we so request your annual and semi-annual financial statements. We do not require that your financial statements be independently audited, but you will send us a copy of your audited statements if you have them audited and we ask for them.

3

3.10  **Insurance.**  You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual.  Unless we instruct you otherwise, your liability insurance policies will name Days Inns of America, Inc., Cendant Finance Holding Corporation and Cendant Corporation, their successors and assigns as additional insureds.

3.11  **Conferences.**  You (or your representative with executive authority if you are an entity) will attend each annual Chain conference and pay the Conference Fee we set for the Chain licensees, if and when we determine to hold an annual Chain conference.  Mandatory recurrent training for licensees and managers described in Section 4.1.3 may be held at a conference. The Fee will be the same for all Chain Facilities that we license in the United States.  You will receive reasonable notice of a Chain conference.

3.12  **Purchasing.**  You will purchase or obtain certain items we designate as proprietary or that bear Marks, such as signage, only from suppliers we approve.  You may purchase any other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.13  **Good Will.**  You will use reasonable efforts to protect, maintain and promote the name "Days Inn" and its distinguishing characteristics, and the other Marks.  You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System. You will participate in Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities.  You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners.

3.14  **Facility Modifications.**  You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay.  You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility.  If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which  we will not unreasonably withhold or delay.  You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.15  **Courtesy Lodging.**  You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

3.16  **Minor Renovations.**  Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 60 days after the notice is issued, having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount. You will perform the Minor Renovations as and when the Minor Renovation Notice requires.  We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged at least 425 points or equivalent and the most recent

4

4.5 **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.

4.6 **Consultations and Standards Compliance.** We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on Facility operation and marketing through our representatives.

4.7 **System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications. We will lend you one copy of the System Standards Manual promptly after we sign this Agreement. We will send you any System Standards Manual revisions and/or supplements as and when issued. We will send you all other publications for Chain licensees and all separate policy statements in effect from time to time.

4.8 **Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.8. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.8. You will pay us an "Audit Fee" of $300.00 when we invoice you for an Audit Fee under Section 3.8. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs to not more than $500.00, effective any time after December 31, 2005. Our inspections are solely for the purposes of checking compliance with System Standards.

5. **Term.** The Term begins on the Effective Date and expires on the day prior to the fifteenth anniversary of the Opening Date. Some of your duties and obligations will survive termination or expiration of this Agreement. You will execute and deliver to us with this Agreement a notarized Declaration of License Agreement in recordable form. We will countersign and return one copy of the Declaration to you. We may, at our option, record the Declaration in the real property records of the county where the Facility is located. The Declaration will be released at your request and expense when this Agreement terminates or expires and you perform your post-termination obligations. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

6. **Initial Fees.**

6.1 **Application and Initial Fees.** We have received from you a non-refundable Application Fee of $1,000.00. You will pay us a non-refundable Initial Fee in the amount of $21,000.00, when you sign this Agreement, which is fully earned when we sign this Agreement.

7. **Recurring Fees, Taxes and Interest.**

7.1   You will pay us certain "Recurring Fees" in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States) ten days after the month in which they accrue, without billing or demand. Recurring Fees include the following:

7

7.1.1 A "Royalty" equal to six and five-tenths percent (6.5%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2 A "Reservation System User Fee" including a "Basic Reservation Charge" for participation in and availability of the Reservation System as set forth in Schedule C, and the charges and fees referred to in Schedule C or Section 4.2 of this Agreement, accrues from the Opening Date until the end of the Term, including during suspension periods. We reserve the right to increase or modify the Reservation System User Fees for all Chain Facilities, and to add other fees and charges for new services, at our sole discretion as to amount or formula, from time to time, but with at least 30 days prior written notice, by substituting a new Schedule C or otherwise, to reflect changes in the fully allocated costs of providing Reservation System-related services, and to add, drop or modify the types of reservation services we offer. You will also pay or reimburse us for travel and other agent commissions paid for certain reservations at the Facility and a "GDS Fee" levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet and other reservation systems and networks. We may charge a reasonable service fee for this service. We may charge Facilities using the System outside the United States for reservation service using a different formula.

7.2 You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for the privilege of doing business by us in your State. You will pay Taxes to us when due.

7.3 "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

7.4 If a transfer occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new licensee for the Facility.

## 8. Indemnifications.

8.1 Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8

8.2 You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3 We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9. Your Assignments, Transfers and Conveyances.

9.1 **Transfer of the Facility.** This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your License is subject to termination when the Transfer occurs. The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2 **Public Offerings and Registered Securities.** You may engage the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $15,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3 **Conditions.** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain

conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a licensee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new license applicant, pay the Application and Relicense Fees then in effect, sign the form of License Agreement we then offer in conversion transactions and agree to renovate the Facility as if it were an existing facility of similar age and condition converting to the System, as we reasonably determine. We will provide a Punch List of improvements we will require after the transferee's Application is submitted to us. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

**9.4  Permitted Transferee Transactions.**  You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the License Agreement form then offered prospective licensees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

**9.5  Attempted Transfers.**  Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

**9.6  Notice of Transfers.**  You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

**10.  Our Assignments.**  We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

**11.  Default and Termination.**

11.1  **Default.**  In addition to the matters identified in Section 3.1, you will be in default under this Agreement if (a) you do not pay us when a payment is due, (b) you do not perform any of your

other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you under Section 11.2. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed. In the case of quality assurance default, if you have acted diligently to cure the default but cannot do so and have entered into a written improvement agreement with us within 30 days after the failing inspection, you may cure the default within 90 days after the failing inspection. We may terminate the License if you do not perform that improvement agreement.

11.2 **Termination.** We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Section 3.1, (2) you discontinue operating the Facility as a "Days Inn", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or License Agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Equity Interest owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

11.3 **Casualty and Condemnation.**

11.3.1 You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty.

11

11.3.2  You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

11.4  **Our Other Remedies.**  We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default.  All Reservation System User Fees accrue during the suspension period.  We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards.  Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform.  We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory.  You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief.  We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice.  Our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

11.5  **Your Remedies.**  If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation.  To the extent permitted by applicable law, this action shall be your exclusive remedy.  We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

## 12.  Liquidated Damages.

12.1  **Generally.**  If we terminate the License under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us within 30 days following the date of termination, as Liquidated Damages, an amount equal to the sum of accrued Royalties and Basic Reservation Charges during the immediately preceding 24 full calendar months (or the number of months remaining in the unexpired Term (the "Ending Period") at the date of termination, whichever is less).  If the Facility has been open for fewer than 24 months, then the amount shall be the average monthly Royalties and Basic Reservation Charges since the Opening Date multiplied by 24.  You will also pay any applicable Taxes assessed on such payment.  Before the Ending Period, Liquidated Damages will not be less than the product of $2,000.00 multiplied by the number of guest rooms in the Facility.  If we terminate this Agreement under Section 3 before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable for termination under Section 11.2.  Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement.  Our right to receive other amounts due under this Agreement is not affected.

12.2  **Condemnation Payments.**  In the event a Condemnation is to occur, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation

described in Section 11.3.2, or until the Condemnation occurs, whichever is longer. You will pay us Liquidated Damages equal to the average daily Royalties and Basic Reservation Charges for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period if the Condemnation is completed before the one year notice period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). You will pay no Liquidated Damages if the Condemnation is completed after the one year notice period expires, but you must pay the fees set forth in Section 7 when due until Condemnation is completed.

**13. Your Duties At and After Termination.** When the License or this Agreement terminates for any reason whatsoever:

**13.1 System Usage Ceases.** You will immediately stop using the System to operate and identify the Facility. You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features.

**13.2    Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Revenues accruing while the Facility is identified as a "Days Inn", including the Reservation System User Fees for so long as the Facility receives service from the Reservation System. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

**13.3 Advance Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

**13.4 Survival of Certain Provisions.** Sections 3.8 (as to audits, for 2 years after termination), 3.9 (as to information relating to the Term, for 2 years after termination), 3.13, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of the License and this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

**14. <u>Your Representations and Warranties</u>.** You expressly represent and warrant to us as follows:

**14.1   Quiet Enjoyment and Financing.**   You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform you obligations under this Agreement.

**14.2   This Transaction.**   You have received, at least 10 business days prior to execution of this Agreement and making any payment to us, our current Uniform Franchise Offering Circular for prospective licensees. Neither we nor any person acting on our behalf has made any oral or written representation or promise to you that is not written in this Agreement on which you are relying to enter into this Agreement. You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement. You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the License Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement.

**14.3   No Misrepresentations or Implied Covenants.**   All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

**15. <u>Proprietary Rights</u>.**

**15.1   Marks and System.**   You will not acquire any interest in or right to use the System or Marks except under this Agreement. You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

**15.2   Inurements.**   All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit. No good will shall attach to any secondary designator that you use.

14

15.3 **Other Locations and Systems.** We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location other than the Location.

There are no territorial rights or agreements between the parties. You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks. We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4 **Confidential Information.** You will take all appropriate actions to preserve the confidentiality of all Confidential Information. Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement. You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software). You will use Confidential Information only for the Facility and to perform under this Agreement. Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended. Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years. We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5 **Litigation.** You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware. We alone handle disputes with third parties concerning use of all or any part of the System. You will cooperate with our efforts to resolve these disputes. We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

16. **Relationship of Parties.**

16.1 **Independence.** You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint

15

venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2  **Joint Status.**  If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

## 17. Legal Matters.

17.1  **Partial Invalidity.**  If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect. If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2  **Waivers, Modifications and Approvals.**  If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel.  All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective.

17.3  **Notices.**  Notices will be effective if in writing and delivered by facsimile transmission with confirmation original sent by first class mail, postage prepaid, by delivery service, with proof of delivery, or by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party at its address stated below or as may be otherwise designated by notice. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

Your name:  AMIT PATEL
Your address: 401 Goose Creek Blvd. North, Goose Creek, SC 29445, Attention: Amit Patel
Your fax No.: (843) 797-6639

Days Inns of America, Inc.:
Our address:  1 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278
              Attention:  Vice President-Franchise Administration; Fax No. (973) 496-5359

17.4  **Remedies.**  Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity. The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement. You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

16

**17.5  Miscellaneous.**  This Agreement will be governed by and construed under the laws of the State of New Jersey. The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey. This Agreement is exclusively for the benefit of the parties. There are no third party beneficiaries. No agreement between us and anyone else is for your benefit. The section headings in this Agreement are for convenience of reference only. We may unilaterally revise Schedule C under this Agreement. This Agreement, together with the exhibits and schedules attached, is the entire agreement (superseding all prior representations, agreements and understandings, oral or written) of the parties about the Facility.

**17.6  Waiver of Jury Trial. The parties waive the right to a jury trial in any action related to this Agreement or the relationship between the licensor, the licensee, any guarantor, and their respective successors and assigns.**

**17.7  Special Acknowledgements.**

**17.7.1  You received our Uniform Franchise Offering Circular ("UFOC") for prospective licensees at least 10 business days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us.  You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.**

**17.7.2  Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.**

**17.7.3  This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.**

**17.7.4  You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement.**

**17.7.5  You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.**

**18.  Special Stipulations.**  The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions.  These are personal to you and are not transferable or assignable except to a Permitted Transferee.

**18.1  Your Additional Termination Right.** You may terminate the License without cause or penalty effective only on the fifth (5th) anniversary of the Opening Date provided you give us at least six (6) months prior written notice of termination and you are not in default under this Agreement at the time notice must be given or at the effective date of termination. You will pay no Liquidated Damages if you comply with the preceding sentence and you perform the post

17

termination obligations specified in this Agreement within 10 days after the effective date of termination. Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs, (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you, or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores less than 425 (or its then equivalent) on a quality assurance inspection and then fails to achieve a score of at least 425 (or its then equivalent) in a reinspection to be performed no sooner than 30 days after the initial inspection.

18.2 **Our Additional Termination Right.** We may terminate the License without cause or penalty effective only on the fifth (5th) anniversary of the Opening Date provided we give you at least six (6) months prior written notice of termination. You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. You will pay no Liquidated Damages if we terminate the License under this Section and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination.

18.3 **Transfer Rights.** If you are not in default under this Agreement, at any time before the end of the second License Year, you may assign this Agreement to a corporation in which you or the persons listed on Schedule B as the original owners of your Equity Interests are the general partners or own at least 51% of the Equity Interests of the corporate general partner or at least 51% of the transferee, if a corporation, at the same time as your interest in the Facility is conveyed to the transferee. The transferee and you must sign and deliver to us the Assignment and Assumption Agreement attached as Exhibit D before you transfer the Facility. You will be charged a $1,500.00 fee. The accounts of the transferee and You must be current at the time of transfer, or we will not recognize the transfer. The transferee must submit an application on our standard form, its partnership agreement or corporate charter, and a copy of the warranty deed from you to the transferee together with the Assignment and Assumption Agreement. We will not recognize the transfer as effective until these documents are completed and delivered to us.

**[Balance of page intentionally left blank}**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

**WE:**
**DAYS INNS OF AMERICA, INC.:**

By:_____

      C. Wayne Miller
      Vice President
      Franchise Administration

Attest:_____
      Assistant Secretary

**YOU, as licensee:**
**AMIT PATEL**

By:_____

      Amit Patel,
      Owner

Attest_____

19

## APPENDIX A

### DEFINITIONS

Agreement means this License Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Fee means the fee we charge for your attendance at a conference for Chain Facilities and their licensees when and if held.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Rules of Operation Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Declaration means the Declaration of License Agreement you and we sign under Section 5.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

Directory means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Days Inn facilities located outside the United States, Canada and Mexico.

20

Effective Date means the date that you first take possession of the Facility.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing at the Location on the Effective Date or afterwards.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Gross Room Revenues means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

21

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Entry Charge means the fee you are to pay for gaining access to the Reservation System when you sign this Agreement and on the first and second anniversaries of the Effective Date under Section 6.2.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.1.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

License Year means the one-year period beginning on the Opening Date and each subsequent anniversary of the Opening Date and ending on the day preceding the next anniversary of the Opening Date.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at 384 US Highway 301 S., Jessup, GA 31545, as more fully described in Schedule A.

Losses and Expenses means all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Days Inn" and other marks (U.S. Reg. Nos.: 1,160,430; 1,160,431; 1,420,612; 1,469,518; and 1,003,834) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Minor Renovation means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.16.

22

Minor Renovation Ceiling Amount means $3,000.00 per guest room.

Minor Renovation Notice means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.16.

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Punch List means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3.

Recurring Fees means fees paid to us on a periodic basis, including without limitation, Royalties, Reservation System User Fees, and other reservation fees and charges as stated in Section 7.

Relicense Fee means the fee your transferee or you pay to us under Section 7 when a Transfer occurs.

Reservation System User Fees means the fees you pay to us under Section 7 and Schedule C for reservation services, including the Basic Reservation Charge and any other fees we charge for services provided by or through the Reservation System.

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Royalty means the monthly fee you pay to us for use of the System under Section 7(a). "Royalties" means the aggregate of all amounts owed as a Royalty.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following:  (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

23

System Standards means the standards for the participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Operating Policies Manual, the Planning and Design Standards Manual and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement.

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility. A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as licensee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Days Inns of America, Inc., a Delaware corporation, its successors and assigns.

24

## SCHEDULE A

(Legal Description of Facility)

DAYEXHC1 3/99
65919

## SCHEDULE B

PART I:        YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest |
|------|---------------------|------------------------|
| Amit Patel | 100.00 % | owner |

PART II:        THE FACILITY:

Primary designation of Facility: Days Inn

Number of approved guest rooms: 100

Parking facilities (number of spaces, description): 100

Other amenities, services and facilities:

PART III:      DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE
COMPLETED AS THE IMPROVEMENT OBLIGATION:

**[Punch List to be attached.]**

26

DAYEXHC1 3/99
65919

DEC-21-1999  14:46      FRAN.ADMIN.DEPT.                                    P.02/09



# FRANCHISOR: DAYS INNS OF AMERICA, INC.
## "SCHEDULE B"
## PUNCHLIST FOR CHANGE OF OWNERSHIP
## DECEMBER 13, 1999
### (Revised December 21, 1999)

**FACILITY**
Days Inn #2299
Highway 301 South
Jesup, GA  31545

**TIER**
Inn

**GUEST ROOMS**
100 Total
  50 Rentable
  50 Out of Order

**OWNER/APPLICANT**
Amit Patel
(843) 751-3009

**FRANCHISE ADMINISTRATION**
Alex Dembowski
(973) 496-5224

**Q.A. REPRESENTATIVE**
Andy Bunch

## PROPERTY CONDITION SUMMARY

**There are 50 rooms scattered throughout wings "A & B' that are off market and out of order in a condition that makes them unrentable.  A complete renovation of all furniture, fixtures and finishes required.  Also, these rooms must be inspected and approved by the Quality Assurance Department of Days Inn prior to renting.**

**"C" wing is a two story building with 32 rooms that is closed and not part of the franchise agreement. The rooms are in a condition that makes them unrentable.  Good quality drapes are required to be installed and drawn at all times to prevent the building from appearing vacant.**

This 36-year-old facility is composed of 4 buildings connected by covered walkways that have exterior corridors, double loaded guestrooms and are 2 stories in height.  Construction is of wood and concrete block with a concrete block, brick and stucco façade.  Guestroom, public area and exterior renovations will be required.  Landscaping requires upgrading to enhance curb appeal.



Jesup, GA
Days Inn #2299

Property is located in rural Central Georgia. The pecan capital of the world is among nearby agricultural facilities. Located on US Highway 301, this town in the 1960's and 70's earned 90% of the town budget annually by way of fines from speeding tickets to tourists.

|  | EXISTING | STANDARD |
|---|---|---|
| Lobby Dimensions: | 800 SF | 800 SF |
| Guest Room Dimensions: | 288 SF (98) | 288 SF |
|  | 324 SF (2) |  |

## COMPLETION TIME

All items listed in this punchlist must be completed within 120 days of the new license agreement unless otherwise noted.



3

Jesup, GA
Days Inn #2299

---

## PROPERTY SIGNAGE

1.   Provide Days Inn exterior signage per Company specifications.  Signage must be
purchased from a vendor approved in advance by the Franchisor.  All existing signage
(building, high-rise, channel letters, billboards, etc.) must be removed.  Modification of
the existing signage or face replacement is prohibited.  The sign on end cap of wing "A"
is not acceptable.

2.   Paint poles of existing great sign.

---

## PROPERTY EXTERIOR

1.   **The Design and Development Department must approve all exterior
renovation plans prior to commencement of work.  Written approval
must be obtained from the Design and Development Department for all
exterior renovation plans prior to the commencement of work.  The
architect or general contractor must provide these plans.  The Company
reserves the right to require additional renovations prior to opening if
written approval of renovation plans was not obtained, or the actual
renovations vary materially from the approved plans.  For assistance
with design concepts, contact the Design/Development Department at
(973) 496-2525.  Renovate to include:**

a.   The enhancement of the roofline around the perimeter of the porte cochere,
commercial and all guestroom buildings is required to improve the property's curb
appeal.  Either a parapet roof line (minimum of 2.6 ft) or a standing seam mansard
roof (4 ft -6 ft) based on the current roof line appearance is required.  Incorporate
Company design features.  Repainting of existing roofline around lounge entry
where peeling is also required.

b.   Install a new exterior finish system such as stucco, synthetic stucco or similar to
conceal brick facade.

c.   Repair damaged areas and paint building exteriors (doors, fascia, soffits, porte
cochere, storefronts and stairwells).

d.   Even though closed, wing "C" is also required to provide a matching, coordinated
exterior appearance with the balance of the property.

e.   Repair cracks, remove weeds and pressure wash/chemically clean all walkways
and stairs.

DEC-21-1999  14:48      .AR.ADMI'' DEPT.                                    P.05/09

4

Jesup, GA
Days Inn #2299

## *PROPERTY EXTERIOR CONTINUED*

2.   Replace railings (including wing "C"). In no event should the railings allow the passage of a 4" sphere at any point and/or a 2" sphere at the base of railings. The top rail must rise a minimum of 42" from the walkway floor. In addition, railings must be consistent throughout the property. Horizontal railings and/or further modifications are not acceptable.

3.   Renovate swimming pool to include:
   a.   Replace pool fence. Pool fence must be a minimum height of 5' (chain link, wood, or vinyl fencing not approved). Gates are required to be self-closing and latching.
   b.   Remove weeds, repair cracks and repaint deck.
   c.   Install depth and "FT" markings on both vertical and horizontal coping tile.
   d.   Maintain clear water appearance in the off season with routine maintenance and the proper use of chemicals. Installing a pool cover is an acceptable option.

4.   Enhance landscaping so that property reflects the local climate. Attention should be directed to the street frontage, within and adjacent to parking areas, at entry driveways, the building perimeter and in courtyards and swimming pool area. Decorative materials (lamps, benches, planters) and finishes (stone, brick, water) should be considered. Uniform mulch throughout the grounds will give a finished, professional appearance. Exterior lighting (parking lot, walkway and building accent) may be used to further enhance the overall landscaping of the property. Maintain a regular grooming schedule. In addition, repair damaged perimeter fencing, decorative brick walls and pond/fountain at front entry. Landscape upgrades must be professionally designed and executed. Renderings, plans and contracts are to be provided to the Design and Development Department. The Company reserves the right to require additional landscape upgrades if written approval is not obtained, or if agreed upon plans are not fully executed.

5.   Hotpatch, reseal and stripe parking lot. Resurface badly cracked and damaged areas. In addition repair/replace/provide wheel stops where damaged/missing to prevent future walkway stains/damage. Strongly recommend improving the grading on lot to eliminate poor drainage.

6.   Repair Dumpster enclosure doors to conceal from guests' view.



DEC-21-1999  14:49        FRAN.ADMIN.DEPT.                              P.06  09

5

Jesup, GA
Days Inn #2299

## PUBLIC AREAS

1.   Upgrade lobby/front desk area to include the following:
     a.   Repair damaged wallcovering. Company requires either vinyl wallcovering
          (minimum 20 ounce) or an approved textured finish.
     b.   Provide new seating package to include tables. Adequate seating must be provided
          in the lobby area. Sofas and chairs must be commercial grade and fabric
          upholstered. Existing wicker furniture is worn and not acceptable.
     c.   Provide new art package. New package must be professionally displayed.
     d.   Provide professionally produced signage to eliminate handwritten/homemade.

2.   The owner is responsible to provide facilities to assist the handicapped in accordance
     with Local, State and Federal codes, regulations and ordinances.

3.   Renovate public restrooms to include:
     a.   Replace plumbing fixtures/trim (sinks and urinals) where tarnished or corroded
          (faucets, drains rings, flush valves, etc.).
     b.   Professionally repair damaged partitions in men's room.

4.   Renovate guest laundry to include:
     a.   Replace flooring with an upgraded ceramic/quarry tile or other material designed
          for commercial use.
     b.   Repair damaged areas and paint room (ceiling, walls, folding table, doors and
          trim).
     c.   Provide cover for existing fluorescent light. Exposed bulbs are not acceptable.

## FOOD AND BEVERAGE FACILITIES

1.   The restaurant and meeting room are currently closed. These facilities must have all
     furniture, fixtures and equipment fully renovated and must comply with all Company,
     local and state specifications prior to opening.

2.   Until such time as the restaurant is opened to the public and able to provide breakfast, the
     property must provide a continental breakfast consisting of fruit juices, coffee,
     decaffeinated coffee, tea, pastries, muffins, croissants or local specialties during breakfast
     hours (6:00 a.m. - 10:00 a.m.).



Jesup, GA
Days Inn #2299

---

**GUEST ROOMS/BATHS** (Rooms Inspected): 105, 123, 128, 124, 130, 132, 134, 136, 144, 144, 240, 238, 232, 222, 220

---

1.  The 50 rooms in wings "A & B" that are currently off market and unrentable must be renovated to comply with all Company specifications for furniture, fixtures and equipment before opening.

2   The Company required electronic locks to be installed on all guestroom entrance doors by January 1, 1997. As of this punchlist date, they have not yet been installed in all rooms (i.e. #132). Electronic locks are required immediately for every room.

3.  Renovate guest rooms to include the following:
    a.  All furniture, finishes and fixtures must coordinate with other room furnishings.
    b.  Replace wall covering in rooms where damaged as in rooms #128 and #144. Provide wallcovering in baths. Company requires either vinyl wall covering (minimum of 15 ounce) or an approved textured finish.
    c.  Replace pictures of inadequate size. A minimum of two framed pictures per room with glass front, (20" x 24" minimum) is required.
    d.  Replace carpets. Company requires minimum 28 ounce cut pile carpet with padding. Carpet must also be wall to wall.
    e.  Refinish furniture where worn as in rooms #128, #124 and #238. Casegoods must be new upon installation. A minimum of one credenza/armoire, a framed wall mirror, one headboard per bed, and one free standing night stand for a two bedded room, two for a single bedded room is required. A writing surface is required to consist of either a desk or an activity table.
    f.  Replace occasional chairs where damaged, burned or stained as in rooms #130, #240 and #238. Two armed chairs per room are required. Chairs must be fabric covered.
    g.  Replace draperies as in rooms #130 and #132. New draperies must have blackout capabilities, be pleated to double fullness, provide for overlapping of panels and must be baton or mechanically operated. Vertical blinds are not acceptable.
    h.  Replace lamps where corroded as in rooms #238, #123 and #144. Provide 2 lamps per headboard wall, a credenza lamp and a floor lamp at leisure area. All wall-mounted lamps must have wire covers or molding, loose cords are not acceptable. Lamp package must be neutral and contemporary (i.e. brass). The use of red or other colors of anodized metal is not acceptable. In addition, replace all damaged lampshades as in rooms #105 and #130.
    i.  A minimum of 50% of guestrooms must be designated as non-smoking rooms.



7

Jesup, GA
Davs Inn #2299

## GUEST ROOMS/BATHS CONTINUED

4.   Renovate bath area to include the following:
   a.   Provide GFI outlets (Ground Fault Interrupts) in all vanity areas.
   b.   Replace vanity mirrors where desilvering as in rooms #124 and #220.  Mirrors should extend the length of the vanity.
   c.   Replace sinks where discolored or chipped as in rooms #128 and #144. .
   d.   Replace plumbing fixtures/trim (sinks or tubs) where tarnished or corroded (faucets, drains rings, etc.) as in rooms #136, #105 and #124.
   e.   Repair and paint damaged ceilings as in rooms #124 and #220.
   f.   Replace bathroom flooring where multi-colored 1" tiles as in rooms #240 and #244. Company requires minimum 2" single color ceramic tile.  Recommend installation of 6"-8" tiles.
   g.   Professionally clean/refinish tubs/wall surrounds where discolored/burned as in rooms #240, #134 and #244.  If deficiencies remain, replacement of tub or wall surround will be required.
   h.   Deep clean/regrout/seal ceramic tile flooring/walls where stained as in rooms #105, #123 and #136.  Recaulk as needed.
   i.   Install a non-skid bathtub treatment in all tubs where peeling or stained as in rooms #136 and #238.

## RECOMMENDATIONS

1.   Set up a display in the lobby to show the architectural renderings and interior design color boards for the proposed work and completion dates.

2.   Provide informational signage to inform guests that work is underway and direct guest away from the construction area.

3.   Renovate several rooms to show guests and potential customers what they can expect in the future.



DEC-21-1999  14:51        .GHL ADMIN. DEPT.                                P.09 09

8

Jesup, GA
Days Inn #2299

HANDWRITTEN OR UNAUTHORIZED REVISIONS TO THIS PUNCHLIST ARE NOT
VALID AND DO NOT BIND THE FRANCHISOR.  ANY AND ALL REVISIONS TO THIS
PUNCHLIST MUST BE MADE AND APPROVED BY THE FRANCHISOR'S QUALITY
ASSURANCE DEPARTMENT.

This Punchlist identifies items that require action due to meet the Franchisor's standards.  The
Franchisor does not warrant that completion of the items on this Punchlist will cause the
converting facility to be in compliance with any applicable federal, state, local codes, ordinances
or regulations.  You (and your architect, contractor and engineer, if applicable) are solely
responsible for conforming the Facility to the requirements of federal, state and local codes,
ordinances and regulations that may apply to your site.

This Punchlist has been prepared on the basis of a random sample inspection of the Facility on
the date specified.  The owner is responsible for meeting all Franchisor Standards.  All repairs,
replacements and improvements must cause the item to meet or exceed the Franchisor's standards
published in the Standards of Operation and Design Manual.

This Punchlist will be subject to revision at the discretion of the Franchisor if the condition of the
facility changes materially or the License (Franchise) Agreement to which this is attached is
executed more than 90 days after the date of the Punchlist.  Note, that ordinary wear and tear,
particularly during busy seasons, may result in the need for additional work to meet entry
standards of the Franchisor.

This is not a License (Franchise) Agreement; the Company is not bound by this punchlist unless
and until the Company signs the License (Franchise) Agreement for the inspected facility.

Note:  Any item on this Punchlist that is not required prior to the new license agreement will
       continue to be evaluated for appearance and condition during any and all Quality
       Assurance evaluations conducted in the interim period.

This punchlist was revised on December 21, 1999. All previous copies are invalid.

1.    revised 12/20/1999 by: ams
2.    revised 12/21/1999 by: ams



2299 DI CO

DAYS INNS OF AMERICA, INC.
SCHEDULE C

RESERVATION SYSTEM USER FEES
PROPERTY TO PROPERTY INCENTIVE PROGRAM
EFFECTIVE JUNE 25, 1999

The Basic Reservation Charge is equal to 2.3% of Gross Room Revenues.

The GDS Fee described in Section 7 is $3.50 per gross reservation communicated through the Global Distribution Systems. Internet-originated reservations carry fees of either (i) $2.50 per gross reservation booked through the Chain's web site or other Internet sources, or (ii) $7.00 per gross reservation booked over the TravelWeb.com Internet booking web site.    Internet reservations may also carry travel agent commissions if the originator qualifies.  If a reservation booked on the GDS, Chain web site or other Internet source, or TravelWeb.com, is canceled by the guest using the same source or web site as was used to make the reservation, you will not be charged the applicable fee.  You may discontinue the Facility's TravelWeb.com listing only by giving us written notice. You must pay the TravelWeb.com fee on all reservations booked through that web site until TravelWeb.com makes the delisting request effective.  The travel agent commission described in Section 7 is 10% of the Gross Room Revenues generated by each reservation originated by the agent.   The general sales agent commission (also known as international sales office commission) is 5% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office.  The "property to property" incentive sales commission is 5% of the Gross Room Revenues generated from each reservation originated by another Chain Facility through the Central Reservation System.

If the number of guest complaints per 1,000 occupied roomnights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish with the approval of the Board of Directors of the Days Inn Licensee Advisory Association, Inc., you will be charged a "First Assessment" of $10.00 for each additional complaint received during that year.  You will be contacted when the complaint is received and you will be responsible to resolve the complaint to the satisfaction of the guest. If you do not respond to any complaint for which you have received a First Assessment within 14 business days after referral to you and the guest contacts us again to seek a response, you will be charged a "Second Assessment" of $25.00, plus the costs we incur to settle the matter with the guest.  If you respond in a timely manner but the guest remains unsatisfied, you will be charged the costs we incur to settle the matter with the guest.   You will be informed of your Annual Facility Allotment when it is established.  The amounts of the First and Second Assessments may be changed on a Chain-wide basis at any time upon 60 days advance notice, with the approval of the Board.

We reserve the right to increase or modify the Basic Reservation Charge and any other Reservation System User Fees for all Chain Facilities in the United States and to add other fees and charges for new services, at our sole discretion as to amount or formula from time to time but with at least 30 days prior written notice, to reflect changes in our fully allocated costs of providing Reservation System-related services, and to add, drop or modify the types of reservation services offered.

27

You will receive an incentive commission equal to 5% of the Gross Room Revenues generated by a reservation originated through the Facility's Reservation System terminal. We may establish rules and procedures for this program in the Manuals. Your incentive commissions are payable monthly in arrears. We may use your incentive commission payments to offset amounts you owe us for Recurring Fees and other charges, or owe our Affiliates for other fees and charges.

28

# GUARANTY

To induce Days Inns of America, Inc., its successors and assigns ("you") to sign the License Agreement (the "Agreement") with the party named as the "Licensee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Licensee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Licensee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Licensee and notice from you we will immediately make each payment and perform or cause Licensee to perform, each unpaid or unperformed obligation of Licensee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims against Licensee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Sections 17.4 (Remedies, Choice of Venue and Consent to Jurisdiction) and 17.6 (Waiver of Jury Trial), applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Licensee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

WITNESSES:

_____

GUARANTORS:

_____ (Seal)
Amit Patel

DAYEXHC1 3/99
65919

# EXHIBIT B



**DAYS INN**

Days Inns Worldwide, Inc.
1 Sylvan Way
Parsippany, New Jersey 07054-0278

Phone (973) 428-9700
Fax (973) 496-5345

FRANCHISE ADMINISTRATION
HOTEL DIVISION

October 26, 2000

*Rec'd 10/27/00 @ 10:03 by B. Lewis*

**VIA AIRBORNE EXPRESS**

Mr. Victor Porter
Partner Group, Inc.
C/o Days Inn
384 S. Hwy. 301
Jesup, GA 31546

RE:   **Notice to Cure Quality Assurance Default** – License Agreement between Amit Patel ("Licensee") and Days Inns Worldwide, Inc. ("DIW") for the operation of Days Inn System Unit #2299-88906 located in Jesup, Georgia (the "Facility")

Dear Mr. Porter:

Our Quality Assurance Department has advised me that the Facility failed its inspection on October 11, 2000 with a score of 367-F. Therefore, I regret to inform you that Licensee is in default of its obligations under the License Agreement. For your convenience, enclosed is a copy of the Inspection Report.

The Facility will be reinspected shortly after the expiration of the thirty (30) day cure period. If a minimum score of at least 425 is not achieved upon reinspection, the Facility may be immediately suspended from Days Inn Reservation System service and DIW may then terminate the License to operate the Facility under the Days Inn System.

Please be advised that your Additional Termination Right will automatically terminate without notice or opportunity to cure, if you fail to cure this default in the next thirty (30) days.

We hope that we can assist you in curing this default. I encourage you to contact Dan Olsen, our Director of Quality Assurance, at (973) 496-8532 who can assist you with an Improvement Plan or answer any questions you may have regarding this inspection. As I'm sure you can imagine, this matter requires your immediate attention.

Sincerely,

Regina Zeruzicki
Director
Franchise Administration

Enclosure

cc:   Amit Patel (Guarantor)
      Joseph R. Kane, Jr.
      C. Wayne Miller



**YEARS OF HOSPITALITY**

2001 (10/98) W   SENDER'S COPY

bb083110 472

Ship #   b6083110-472
Desc.
Bill Ref   01-55-05000

BBBMDM

10/26/00 Wt.   1-1   1 Fl Zip/Postal Code   31546
        Dims                    Chg         94.35
        Bill To

**DAYS INN** ®

## QUALITY ASSURANCE
## AND TRADEMARK
## EVALUATION REPORT

Date: _10-11-2000_  Time Arr: _12:30 P_  Time Dep: _4:30 P_
Location Name: _Jesup_
Address: _384  Hwy  301 S._
City: _Jesup_  State: _GA_  Zip Code: _31545_
Product Designation: _Inn_  Unit #: _2299_
No. of Rms: _90/100_  General Manager: _Mr Victor Porter_
Owner: _Victor & Sheila Porter_
Type of Evaluation: _Routine_

| Inn/Hotel Score | Automatic HSKP "F" | Food & Beverage |
|---|---|---|
| 367-F | NO | N/A |

Prior Inspection Scores (most recent first)
| Date 6-20-00 | Score 388 | Score Closed |
| Date 2-4-00 | Score 329 | Score Closed |

### QUALITY ASSURANCE REVIEW RATINGS

**Guest Rooms**
A. Deficiency points accumulated _329_
B. Penalty points accumulated on follow-ups _0_
C. Total deficiency and penalty points (A+B) _329_
D. Number of guest rooms reviewed _8_
E. Deficiency and penalty points per room reviewed (C/D) _41_
F. Standard points deducted _40_
G. Total points deducted Guest Rooms (E + F) _81_

**Public Areas**
H. Deficiency points accumulated _22_
I. Penalty points accumulated on follow-ups _0_
J. Standard points deducted _30_
K. Total points deducted Public Areas (H+I+J) _52_

L. Total Bonus points _0_

**INN/HOTEL SCORE (500 - (G + K)) + L** _367_

M. Number of Hskp "N's" = _8_ x 20 pts = _160_ / D = _20_
Automatic Hskp Failure (if M equals 40 or more points)  Y (N)

**Food & Beverage**
A. Deficiency points accumulated _N/A_
B. Penalty points accumulated on follow-ups
C. Standard points deducted
D. Total points deducted Food & Beverage (A+B+C)

**FOOD & BEVERAGE SCORE (500 - D)** _N/A_

### MAJOR DEFICIENCIES / STANDARDS

| | Warned | Deducted |
|---|---|---|
| Logo Graphics (20) | | |
| Mgt. Training (20) | | |
| Operations (30) | | |
| Locks (25) | | |
| Smoke Detectors (20) | | |
| Uniforms (20) (10) (5) | | |
| Pub. Area Refurb (20) | | 20 |
| Guest Room Refurb (20) | | 20 |
| Room Standards (10) | | 20 |
| Insects/Pests (20) | | |
| Other (Specify): | | |
| Other (Specify): USA Today | | 10 |

### OPERATIONS OVERVIEW

| | Pts Lost Today | System Avg |
|---|---|---|
| Housekeeping | 24 | 11 |
| Operations | 13 | 15 |
| Maintenance | 6 | 9 |
| Capital | 94 | 30 |

### BONUS POINT RECAP

| GM Letter: _Incomplete_ | + | 0 |
| Other (Specify): | + | |
| Other (Specify): | + | |

### OVERALL COMMENTS

_Only 80 rooms are up and going._
_Please address Summary Notes Pg items._

I hereby acknowledge receipt of the above report.
Signed: _____
Print Name/Title: _V Porter - Managers_

I hereby certify that on the above date, I conducted a Quality Assurance Evaluation Report of the above designated Days Inn System facility.
Signed: _Faye Seawell_
Print Name: _Faye Seawell_

## DAYS INNS OF AMERICA, INC.

339 Jefferson Road   Parsippany, New Jersey 07054   (973) 428-9700   Fax (973) 496-1377

DI072098

Unit # _22_
Date _10-_ _2000_

**GENERAL AREA**

190 Points Total

| REVIEW ITEM | DEFICIENCY DESCRIPTION | A | B | C | F | H | O | M | C |
|---|---|---|---|---|---|---|---|---|---|
| **EXTERIOR SIGNAGE** | (Billboard Location: _None Observed_) | 0 | 4 | 10 | 20 | | | | |
| Pylon/Building/Billboards | | | | | | | | | |
| Panels/Graphics | | | | | | | | | |
| Stanchions/Van Condition | | | | | | | | | |
| Illumination | | | | | | | | | |
| **EXTERIOR - Grounds** | | 0 | 4 | (10) | 20 | | | | /0 |
| Paving/Parking | _faded, cracked, stained_ | | | X | | | | | |
| Fencing/Dumpster | | | | | | | | | |
| Landscaping | | | | | | | | | |
| Lighting | | | | | | | | | |
| **EXTERIOR - Building** | | 0 | (4) | 10 | 20 | | | | 4 |
| Railings | _Not to Standard_ | | X | | | | | | |
| Facia/Soffit/Other | | | | | | | | | |
| Storefronts/HVAC Louvers/Windows | | | | | | | | | |
| Porte Cochere/Canopy | | | | | | | | | |
| Lighting | | | | | | | | | |
| **CURB APPEAL** | | 0 | (4) | 10 | 20 | | | | 4 |
| Structural Design/Other | _Flat roof_ | | X | | | | | | |
| Lighting/Landscaping | | | | | | | | | |
| Décor/Paint Scheme | | | | | | | | | |
| **SWIMMING POOL** | _Closed for season_ | 0 | 4 | 10 | 20 | | | | |
| Pool/Water Appearance | | | | | | | | | |
| Life Saving Equipment/Rules/Markings | | | | | | | | | |
| Deck/Landscaping | | | | | | | | | |
| Furniture/Lighting | | | | | | | | | |
| Fencing/Gate | | | | | | | | | |
| Off-season Security & Appearance | | | | | | | | | |
| Telephone/Chemical Storage | | | | | | | | | |
| **PLAYGROUND/RECREATION AREAS** | | 0 | 1 | 2 | 5 | | | | |
| Exercise Room/Sauna/Game Room | | | | | | | | | |
| **FRONT DESK/LOBBY** | | 0 | 4 | 10 | 20 | | | | |
| Furniture/Fixtures/Finishes | | | | | | | | | |
| Desk | | | | | | | | | |
| Public Restrooms | | | | | | | | | |
| Hospitality/Breakfast Area | | | | | | | | | |
| **STAFF PROFESSIONALISM** | | 0 | 3 | 10 | 15 | | | | |
| Attitude/Knowledge | | | | | | | | | |
| **MANAGEMENT OPERATIONS - Front Desk/Laundry/Hskp/Maint** | | 0 | 2 | 6 | 10 | | | | |
| Signage | | Pass | | Fail | | | | | |
| Public/House Telephones | | Pass | | Fail | | | | | |
| Directories/Other Required Materials | | Pass | | Fail | | | | | |
| PMS System | | Pass | | Fail | | | | | |
| Switchboard | | Pass | | Fail | | | | | |
| First Aid Kits/Fire Extinguishers | | Pass | | Fail | | | | | |
| Emergency Key/Emergency #'s | | Pass | | Fail | | | | | |
| Marketing Programs/Brochure Rack | | Pass | | Fail | | | | | |
| Non-Smoking Rooms | | Pass | | Fail | | | | | |
| Safe Deposit Boxes | | Pass | | Fail | | | | | |
| Public Restroom Supplies | | Pass | | Fail | | | | | |
| Bell Service/Van Service | | Pass | | Fail | | | | | |
| Lost & Found/Required Posters | | Pass | | Fail | | | | | |
| Flammable Storage | | Pass | | Fail | | | | | |
| Uniforms | | Pass | | Fail | | | | | |
| Storage Areas/Linen Chutes | | Pass | | Fail | | | | | |
| Other (Specify): | | Pass | | Fail | | | | | |
| **PASSAGEWAYS** | | 0 | (4) | 10 | 20 | | | | 4 |
| Walkways | _Worn chipped paint; cobwebs_ | | X | | | | | | |
| Corridors/Public Areas | | | | | | | | | |
| Doors/Room Numbers | | | | | | | | | |
| Steps/Elevators | | | | | | | | | |
| Fire Extinguishers/Alarm System | | | | | | | | | |
| Illumination | | | | | | | | | |
| Emergency/Exit Lighting | | | | | | | | | |
| Directional/Service Signs | | | | | | | | | |
| **ICE/VENDING AREAS** | | 0 | 2 | 5 | 10 | | | | |
| Ice/Vending Machines/Guest Laundry | | | | | | | | | |
| Vending Area Finishes | | | | | | | | | |
| **LAUNDRY/EQUIPMENT/MAINT** | | 0 | 2 | 5 | 10 | | | | |
| Finishes/Illumination | | | | | | | | | |
| Equipment/Ventilation/Visibility | | | | | | | | | |
| Storerooms/Housekeeping Carts | | | | | | | | | |
| | **TOTAL POINTS DEDUCTED GENERAL AREAS:** | | | 22 | | 4 | 0 | 0 | 22 |

Pass/Fail Management Ops Scoring:  All items pass = A; 1 or 2 items fail = B; 3 or 4 items fail = C; 5 or more items fail = F.

DHRT051498

Unit # 22
Date 10-11-2000
**GUEST ROOMS**
310 Points
Page 1 of 3

| Review Item | Room #106 Deficiency | Pts (A B C F) | Room #216 Deficiency | Pts (A B C F) | Room #232 Deficiency | Pts (A B C F) |
|---|---|---|---|---|---|---|
| **Doors/Windows** | | 0 2 5 10 | | 0 2 5 10 | | 0 2 5 10 |
| Entrance/Connecting Door | SC | ☒ | | | PP frame | ☒ |
| Window/Sliding Door/Balcony | | | | | | |
| Bathroom Door | | | | | | |
| **Locks/Hardware** | | 0 3 7 15 | | 0 3 7 15 | | 0 3 7 15 |
| One-Way Viewer/Self Closure | | | TR | | | |
| Electronic Lock | | | | | | |
| Secondary Lock | | | | | | |
| Connecting Door Locks | | | | | | |
| Window/Sliding Door Locks | | | | | | |
| **Room Finishes** | | 0 4 10 20 | | 0 4 10 20 | | 0 4 10 20 |
| Walls | LC Vinyl | ☒ | | | | |
| Ceilings | | | | | | |
| Pictures | | | | | | |
| **Room Carpet** | St | 0 5 12 25 | St | 0 5 12 25 | St | 0 5 12 25 |
| **Case Goods** | | 0 5 12 25 | | 0 5 12 25 | | 0 5 12 25 |
| Credenza | | | | | Ch | ☒ |
| Wall Mirror/Full Length Mirror | | | | | | |
| Headboard | | | | | | |
| Nightstand | SC | ☒ | | | | |
| Activity Table/Desk | | | | | | |
| Leisure Chairs | St | ☒ | no | ☒ | | |
| Desk chair | | | | | | |
| **Light Fixtures** | | 0 3 8 15 | | 0 3 8 15 | | 0 3 8 15 |
| Shade | | | | | | |
| Illumination | | | | | | |
| Lamps | | | Du | | | |
| **Telephone** | | 0 3 8 15 | | 0 3 8 15 | | 0 3 8 15 |
| Telephone/Operation | | | | | | |
| Message Lights | | | | | | |
| **Television** | | 0 4 10 20 | | 0 4 10 20 | | 0 4 10 20 |
| Cabinet/Remote Control | | | | | | |
| Reception/Required Channels | | | | | | |
| **HVAC** | | 0 3 8 15 | | 0 3 8 15 | | 0 3 8 15 |
| Unit/Operation | | | | | | |
| Filter/Controls | | | | | | |
| **Beds** | | 0 5 12 25 | | 0 5 12 25 | | 0 5 12 25 |
| **Spreads/Drapes/Linen** | | 0 4 10 20 | | 0 4 10 20 | | 0 4 10 20 |
| Bedspreads | St | ☒ | | | | |
| Sheets/Pillow Cases | St | ☒ | | | | |
| Mattress Pads | DA | ☒ | | | | |
| Blankets | | | | | | |
| Pillows | MM | ☒ | | | | |
| Drapes | | | | | | |
| **Smoke Detector** | | 0 1 3 5 | | 0 1 3 5 | | 0 1 3 5 |
| **Room Supplies** | | 0 1 3 5 | | 0 1 3 5 | | 0 1 3 5 |
| **Closet Area** | | 0 1 3 5 | | 0 1 3 5 | | 0 1 3 5 |
| **Vanity** | | 0 4 10 20 | | 0 4 10 20 | | 0 4 10 20 |
| Vanity | | | | | | |
| Sink | | | | | | |
| Mirror | | | | | | |
| Light Fixture/Illumination | | | | | | |
| Tissue Holders | | | | | | |
| Plumbing Fixtures | | | | | | |
| **Tub/Shower** | | 0 4 10 20 | | 0 4 10 20 | | 0 4 10 20 |
| Tub/Tub Surround/Non-Skid | | | | | | |
| Soap Dish/Shower Head | | | | | | |
| Shower Curtain | | | | | | |
| Plumbing Fixtures | | | | | | |
| Grout/Caulk | DC | ☒ | | | | |
| Water Temperature/Pressure | | | | | | |
| **Towels/Towel Racks** | | 0 4 10 20 | | 0 4 10 20 | | 0 4 10 20 |
| Towels | | | | | | |
| Towel Racks | | | | | | |
| **Bathroom Finishes** | | 0 4 10 20 | | 0 4 10 20 | | 0 4 10 20 |
| Walls | DC Grout | ☒ | BD | | | |
| Ceilings | | | | | | |
| Floor | | | | | | |
| Tile Grout/Caulk | | | | | | |
| Ventilation | | | | | | |
| **Toilet** | | 0 2 6 10 | | 0 2 6 10 | | 0 2 6 10 |
| Lids/Seats/Bumpers | | | ML | ☒ | | |
| Bowl/Function | | | | | | |

| Page Totals | Room #106 | Room #216 | Room #232 |
|---|---|---|---|
| Total Pts Ded: | 34 | 19 | 12 |
| N's x 20: | 0 | 3 N's x 20: 60 | 0 |
| Room Total: | 34 | 79 | 12 |

DHRT051498

Unit # _2C_
Date _10-7-2000_

**GUEST ROOMS**

319 Points
Page _2_ of _3_

| Review Item | Room #: 241 Room Stat: 1/C Deficiency | Points Deducted A\|B\|C\|F | C L N | O P S | M N T | C A P | Room #: 141 Room Stat: 1/C Deficiency | Points Deducted A\|B\|C\|F | C L N | O P S | M N T | C A P | Room #: 133 Room Stat: 1/C Deficiency | Points Deducted A\|B\|C\|F | C L N | O P S | M N T | C A P |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Doors/Windows | | 0\|2\|5\|10 N | | | | | | 0\|2\|5\|10 | | | | | | 0\|2\|5\|10 | | | | |
| Entrance/Connecting Door | | | | | | | | | | | | | | | | | | |
| Window/Sliding Door/Balcony | | | | | | | | | | | | | | | | | | |
| Bathroom Door | DC | | | | | | | | | | | | | | | | | |
| Locks/Hardware | | 0\|3\|7\|15 | | | | | | 0\|3\|7\|15 | | | | | | 0\|3\|7\|15 | | | | |
| One-Way Viewer/Self Closure | | | | | | | | | | | | | | | | | | |
| Electronic Lock | | | | | | | | | | | | | | | | | | |
| Secondary Lock | | | | | | | | | | | | | | | | | | |
| Connecting Door Locks | | | | | | | | | | | | | | | | | | |
| Window/Sliding Door Locks | | | | | | | | | | | | | | | | | | |
| Room Finishes | | 0\|4\|10\|20 | | | | | | 0\|(4)\|10\|20 | | | | 4 | | 0\|(4)\|10\|20 | | | | 4 |
| Walls | | | | | | | SC | X | | | | | Lo Cove Base | X | | | | |
| Ceilings | | | | | | | | | | | | | | | | | | |
| Pictures | | | | | | | | | | | | | | | | | | |
| Room Carpet | St Bu | 0\|5\|12\|25 | | | 5 | | | 0\|5\|12\|25 | | | | | MT, St | 0\|5\|12\|25 | | | | 2 |
| Case Goods | | 0\|5\|(12)\|25 | | | | | | 0\|5\|12\|25 | | | 5 | | 0\|(5)\|12\|25 | | | | 5 |
| Credenza | | | | | | | | | | | | | | | | | | |
| Wall Mirror/Full Length Mirror | | | | | | | OS | X | | | | | | | | | | |
| Headboard | | | | | | | | | | | | | | | | | | |
| Nightstand | | | | | | | | | | | | | | | | | | |
| Activity Table/Desk | | | | | | | | | | | | | Cn | | | | | |
| Leisure Chairs | M. one. | | X | | | | | | | | | | | X | | | | |
| Desk chair | | | | | | | | | | | | | SC | X | | | | |
| Light Fixtures | | 0\|3\|(8)\|15 | | | X | | | 0\|3\|(8)\|15 | | | 70 | | | 0\|3\|8\|15 | | | | |
| Shade | | | | | | | | | | | | | | | | | | |
| Illumination | | | | | | | | | | | | | | | | | | |
| Lamps | TA | | X | | | | TA | | X | | | | | | | | | |
| Telephone | | 0\|3\|8\|15 | | | | | | 0\|3\|8\|15 | | | | | | 0\|3\|8\|15 | | | | |
| Telephone/Operation | | | | | | | | | | | | | | | | | | |
| Message Lights | | | | | | | | | | | | | | | | | | |
| Television | | 0\|(4)\|10\|20 | | | 4 | | | 0\|4\|10\|20 | | | | | | 0\|4\|10\|20 | | | | |
| Cable/Remote Control | BX Door | | X | | | | | | | | | | | | | | | |
| Reception/Required Channels | | | | | | | | | | | | | | | | | | |
| HVAC | | 0\|3\|8\|15 | | | | | | 0\|3\|8\|15 | | | | | | 0\|3\|8\|15 | | | | |
| Unit/Operation | | | | | | | | | | | | | | | | | | |
| Filter/Controls | | | | | | | | | | | | | | | | | | |
| Beds | | 0\|5\|12\|25 | | | | | | 0\|5\|12\|25 | | | | | | 0\|5\|12\|25 | | | | |
| Spreads/Drapes/Linen | | 0\|(4)\|10\|20 | | | 4 | | | 0\|4\|10\|20 | | | | | | 0\|4\|10\|20 | | | | |
| Bedspreads | St | | X | | | | | | | | | | | | | | | |
| Sheets/Pillow Cases | | | | | | | | | | | | | | | | | | |
| Mattress Pads | | | | | | | | | | | | | | | | | | |
| Blankets | Ho | | X | | | | | | | | | | | | | | | |
| Pillows | | | | | | | | | | | | | | | | | | |
| Drapes | | | | | | | | | | | | | | | | | | |
| Smoke Detector | | 0\|1\|3\|5 | | | | | | 0\|1\|3\|5 | | | | | | 0\|1\|3\|5 | | | | |
| Room Supplies | | 0\|1\|3\|5 | | | | | | 0\|1\|3\|5 | | | | | | 0\|1\|3\|5 | | | | |
| Closet Area | | 0\|1\|3\|5 | | | | | | 0\|1\|3\|5 | | | | | | 0\|1\|3\|5 | | | | |
| Vanity | | 0\|4\|10\|20 | | | | | | 0\|(4)\|10\|20 | | | 4 | | | 0\|4\|10\|20 | | | | |
| Vanity | | | | | | | | | | | | | | | | | | |
| Sink | | | | | | | | | | | | | | | | | | |
| Mirror | | | | | | | OS | X | | | | | | | | | | |
| Light Fixture/Illumination | | | | | | | | | | | | | | | | | | |
| Tissue Holders | | | | | | | | | | | | | | | | | | |
| Plumbing Fixtures | | | | | | | | | | | | | | | | | | |
| Tub/Shower | | 0\|4\|10\|20 N | | | | | | 0\|4\|10\|20 N | | | | | | 0\|4\|(10)\|20 | | | | 10 |
| Tub/Tub Surround/Non-Skid | | | | | | | | | | | | | PI | | | | | |
| Soap Dish/Shower Head | | | | | | | | | | | | | | X | | | | |
| Shower Curtain | BD | | | | | | BD | | | | | | | | | | | |
| Plumbing Fixtures | | | | | | | | | | | | | | | | | | |
| Grout/Caulk | | | | | | | | | | | | | DC | | | | | |
| Water Temperature/Pressure | | | | | | | | | | | | | | X | | | | |
| Towels/Towel Racks | | 0\|4\|10\|20 | | | | | | 0\|4\|10\|20 | | | | | | 0\|4\|10\|20 | | | | |
| Towels | | | | | | | | | | | | | | | | | | |
| Towel Racks | | | | | | | | | | | | | | | | | | |
| Bathroom Finishes | | 0\|4\|10\|20 | | | | | | 0\|4\|10\|20 | | | | | | 0\|(4)\|10\|20 | | | | 4 |
| Walls | | | | | | | | | | | | | | | | | | |
| Ceilings | | | | | | | | | | | | | PI | X | | | | |
| Floor | | | | | | | | | | | | | | | | | | |
| Tile Grout/Caulk | | | | | | | | | | | | | | | | | | |
| Ventilation | | | | | | | | | | | | | | | | | | |
| Toilet | | 0\|(2)\|6\|10 | | | 2 | | | 0\|2\|6\|10 | | | | | | 0\|2\|6\|10 | | | | |
| Lids/Seats/Bumpers | | | | | | | | | | | | | | | | | | |
| Bowl/Function | St | | X | | | | | | | | | | | | | | | |

| Page Totals | Total Pts Ded: 35 | 21 45 | Total Pts Ded: 21 | 1 044 | Total Pts Ded: 28 | 008 0 |
|---|---|---|---|---|---|---|
| | 2 N's x 20: 40 | 26 45 | 1 N's x 20: 20 | | 0 N's x 20: 0 | |
| | Room Total: 75 | | Room Total: 41 | | Room Total: 28 | |

DHRT05149B